the judges of the United States Court of Appeals for the Fourth Circuit. Oh yay, oh yay, oh yay. All persons having a matter of formal business before the Honorable of the United States Court of Appeals for the Fourth Circuit admonish you to drop that and get their attention. For the court is now sitting. God save the United States and its Honorable Court. Let's be seated. Good morning and welcome to the Court of Appeals. You might recognize there's an left. That's because Senior Judge Fraxler, former Chief Judge in this court, will be participating remotely by audio, but he can hear you quite clearly. Can you not, Chief? I can. Thank you, Judge Mann. Excellent. And to my right, of course, is Judge Richardson of South Carolina. We have three cases. We were here today. We're going to start our argument this morning with United States v. Smart. We will hear from Appellate's counsel. Good morning, Your Honor, and may it please the court. My name is Jim Thurr. I represent Mr. Smart. There are three issues before the court principally today. I'd like to start with the Competing Trial Act, one which, as the court knows, should the court rule in my client's favor, would avoid the need to address the other two, as it would require remand with instructions. Why is that? I mean, if we found, and we can talk about the Speedy Trial Act, but if we found there's a Speedy Trial Act violation, wouldn't we still be well advised to address the Fourth Amendment issues rather than sending it back, assuming the district court judge is going to do precisely what he has done before? And so we ought to make a call on that, no? Your Honor, I would be happy for the court to do that. I just note that in Henry, the court did not address suppression after it found the Speedy Trial Act violation and remanded for dismissal with or without prejudice. Your point is, we could, but we need not, is your position? Yes, Your Honor, that's correct. So the issue here... Now tell me, how much time are you going to spend on the Speedy Trial Act? I'm going to get right to it. I've been a judge for a long time. Tell me a case in which a case is going back on the Speedy Trial Act. I'm not saying it shouldn't be, but how often does that happen? Well, it doesn't happen often, Your Honor, but Henry is, of course, the example that I'll point to from 2008. And Henry is evaluating Zedner and evaluating what happened below, remanded with instructions to dismiss, and again, up to the trial court, whether that would be with or without prejudice. And I think the situation we have here, Velasquez, just in 2022, again, in March, which both parties addressed through supplemental briefing, also remanded for dismissal with or without prejudice. So it doesn't happen a lot, Your Honor. I recognize that. But when it happens, as Zedner teaches, if there's a violation, it needs to go back. Can I ask a question about the Speedy Trial Act? And maybe we want to talk about the Fourth Amendment. But what is the appropriate remedy? Assuming that, if I give you that you have identified a Speedy Trial Act violation, just hypothetically, you say two different things as the remedy, neither with argument or support for what the answer is. One, you say we should vacate the convictions, plural. And then in another instance, you say we should dismiss the indictment, non-plural, which seem inconsistent, right, because there are two indictments and there are three convictions. But you don't explain why any of that. And so, if I assume there's a problem with the conspiracy, the initial indictment that was a conspiracy on the Speedy Trial Act, what do you think the right remedy is? And help me understand why. Yes, Your Honor. Thank you. So, as you pointed out, we had the initial indictment and a superseding indictment. And we contend the Speedy Trial Act violation occurred in the period of the original indictment. And we, I believe... And you agree that he was convicted by the jury on the superseding indictment? Absolutely, Your Honor. The record is clear in that regard. And so, if we dismiss the original indictment, or we found the district court should have conviction, right, because there are two different indictments. They are legally operative just because there's a superseding indictment. It doesn't vacate or void the original indictment. They're both individual grand jury actions. Well, that's true, Your Honor. I do believe, though, that you look at Henry and the way Henry addressed the violation here... Did Henry address the superseding indictment? No, Your Honor. I didn't think so. I mean, the difference is, right, in all the cases we've talked about, it refers to dismissing the indictment, but there's only one indictment. Right? And so, when we look at the language of 3161, it refers to dismissing the indictment. All right? So, great. Maybe you've convinced me that we should dismiss the original indictment. I don't think that matters here, but that's why the remedy seems to make a big difference to me. Well, Your Honor, I believe that if the original indictment had been properly dismissed on the Speedy Trial Act basis, then the case would not have proceeded. The superseding... Why not? As long as it was dismissed without prejudice, right, then the superseding indictment is issued and everybody agrees that that fixes the problem, right? If the timing was slightly different, there'd be no question it fixes the problem. I just don't know why it doesn't fix the problem for the Speedy Trial Act. Now, Sixth Amendment, totally different story, but we're not talking about that. For the Speedy Trial Act, what I don't understand is why the superseding indictment is affected by your argument at all. Well, Your Honor, I believe the trial court has to have the opportunity to determine whether to dismiss with or without prejudice. So, with the original indictment, it should have had the opportunity to make that decision. It never had. And if it had decided to dismiss with prejudice, following the Speedy Trial Act violation on the original indictment, that would have precluded. Totally fair, but that's now our decision, right? We're looking at that and we would say, and if we thought it should have been done with prejudice, your argument might hold. But if instead we thought it should be done without prejudice, the original indictment only, without prejudice, then the superseding indictment ought to is that the prejudice or without prejudice determination is one for the trial court after evaluating the circumstances. That's what they did both in Velasquez and in Henry. So, while I don't question the court's authority to do what it will, I do believe that prior panels have looked at the trial court to make that determination. Can I ask you about the Fourth Amendment question? And again, I sort of want to ask a little bit of the same question. Assume hypothetically, or maybe not so hypothetically, that I agree there's a Fourth Amendment problem with the Louisiana stop. First of all, help me understand why that is not harmless with respect to the conspiracy count, but assume I get that. Help me understand why it's not harmless with respect to the two PWID counts from 2018. Well, Your Honor, so the two, the PWID counts on it, the entire presentation by the government of its evidence was predicated on the confession extracted from Mr. Smart after the Suffolk stop. That's the November 18th stop. Yes, Your Honor. Okay, all right. So, I get that, but stay focused for me. If I just am talking about the five kilos, right, from the Louisiana stop, I just want to isolate that. I understand we can look at them together, but I wanted to isolate that for just a minute. And I concluded that that was certainly harmful with respect to conspiracy conviction. But what I'm trying hard to understand is what plausible connection it's got to the two 2018 PWID. So, assume I suppressed, I mean, I say, yes, that should be suppressed. The five kilos should be suppressed. But now I've got two PWID convictions that seem wholly unrelated to a Louisiana traffic stop a year earlier. Well, Your Honor, I think as the record shows, the course of the investigation was predicated on the Louisiana stop. Agent Smith testified that he corroborated Pittman, the confidential informant, because he knew about the Louisiana stop and the statements made by Mr. Smart subsequent to that stop. And the argument that we've attempted to present in the brief is that it carried through. When you look at the subsequent course of the investigation, the GPS monitoring of the vehicles, the trash pull, it's all engendered by, it's all born from the Louisiana stop, which was constitutionally defective and the statements thereby that were derived. Like a fruit of the poisonous tree? You're saying like, if that was illegal, then the fact that that motivated future law enforcement action that discovered independent criminal violations, we suppress all of that? I mean, that seems like a pretty broad reading of the, what I think you're making is like a fruit of the poisonous tree idea, right? It's not getting from that. It might motivate the actions, but that's not what we think about as a fruit of the poisonous tree. Your Honor, I agree it's a stress, but when you look at what happened subsequently, there was no independent basis. In other words, it was all engendered by the Louisiana stop. And Smith, I believe, testified quite clear to that, both at the suppression hearing and again at trial, that the involvement through the task force officer Dasky for the May 23, 2018, which was the Pittman controlled by, that was engendered by Smith verifying reliability of Pittman based on the Louisiana stop. But for the Louisiana stop, Smith would have, Pittman was simply an uncorroborated, lacking any indicia of reliability, confidential informant. But law enforcement often uses those informants to do control buys, right? You need to have indicia of reliability if you're going to rely on them, their information for a search warrant or something, but not to do a control buy, right? I agree generally law enforcement likes to have a reliable informant when they're doing a control buy, but that's not a necessary step. Like that, you're importing the idea of an indicia of reliability, which is a search warrant idea, relying on an informant and what's required to use an informant to make a control buy, which are two different standards. Your Honor, I understand the point. When you look at the Pittman control buy, the evidence linking Mr. Smart to that transaction consisted only of Pittman saying he believed Mr. Smart was the source of the drug, but there was no independent verification that he in fact gave the drugs to Mr. Jones, the cousin, who in fact delivered them to Mr. Pittman. So I recognize that I am importing the issue of the taint from a search warrant context, but for Louisiana, the May 23, 18 control buy never happened. But it was Smart who picked up his cousin, took him to the control buy. That's correct, Your Honor. And when you look at what Pittman actually testified to, he testified that Joe said he needed to get the drug. And there was no surveillance on Mr. Smart showing that he brought drugs to Mr. Jones. He simply went to Mr. Jones' house and drove him to meet Mr. Pittman. Mr. Smart never got out of the car. So there was no evidence other than that Mr. Pittman and his purported reliability based on the Louisiana stop per Agent Smith, that Mr. Smart was the source of the narcotics. And if I could address quickly the issue of the Suffolk stop, the Suffolk stop likewise was dependent upon the Louisiana stop in that the reason why Agent Smith told Cooper Miller to pull him over was based on Louisiana. That was based on... Not just Louisiana, right? I mean, you know, the district court identified a number of other things that supported probable cause, right? I mean, in essence, what I'm hearing you say is subjectively the five kilos motivated this investigation. Totally fair, right? But we don't look at the subjective motivations of officers after Wren. We look at the objective basics, right? And so even if we take away the Louisiana stop altogether, it doesn't matter what that would do to their subjective motivations. We look at whether it's objectively probable cause, which means we look at the May 18, the August 18, the trash pull, all of that information and say, is that probable cause? Right? Yes, Your Honor. But if you look at the other factors there, you know, the August was a consumption quantity of cocaine. Can you be arrested for mere possession of cocaine? It's a misdemeanor under the federal... Which means you can be arrested, which means there's probable cause of a crime. You can be arrested if it occurs in the presence of the officer, otherwise you need a warrant. I mean, the point being is, insofar as the additional evidence, this other evidence, other than the Louisiana, you bring up this whole business of taint through the course of this treaty. It sort of seems like me for the first time hearing this, but what is it about that incident in Louisiana that taints the kind of practice that the trial court relied on for your honor? If you look at the Suffolk stop, the November 2018 stop, the evidence, the information against Mr. Smart was corroborated by Smith based on statements from Louisiana and him investigating the Houston location that Mr. Smart identified in his statements to the Louisiana police. That then corroborated Pittman. That led to the trash bowl. The trash bowl, the soap box with some plastic bag, the cocaine residue where there was no forensic evidence of cocaine, there was no description. There wasn't even evidence showing that the trash bag from which that box came from had any letters, correspondence, identifying papers in Mr. Smart. All right, so assuming that wouldn't be probable cause alone, you don't argue that we couldn't consider it along with the other information to determine whether probable cause exists, right? Your honor, the standard is you look at each factor in isolation, then in the totality. I agree. So in innocuous, the case law is clear, innocuous facts can, if they're in part of a group, lead to a fatality finding. And I have gone over my time. You have a little time left. Judge Strachlan, do you have any questions? No, thank you. We'll hear from the appellee and we'll come back to you for some additional time. Thank you, your honor. Good morning and may it please the court, Jacqueline Bashar for the United States. The court should affirm the defendant's convictions for three reasons. First, the defendant waived his challenge to the October 2019 continuance. And even if the court reviews, the district court properly granted that continuance in the ends of justice. Second, the district court did not err in denying the motions to suppress because there was reasonable suspicion to conduct the canine sniff during the first stop and probable cause to detain the defendant after the second stop. Third, the jury heard substantial evidence to support the defendant's conviction for drug conspiracy. So can you start with the first one? I know you focus on waiver. And assume for a minute that I agree with you that the defendant didn't make these arguments in the pro se filing. But the district court ruled on it. We don't typically find waiver in a scenario where the district court actually issues a ruling. So the district court doesn't rely on waiver. You didn't argue waiver in the district court. Instead, the district court addressed it on the merits. Why would we find waiver from the defendant in a scenario where the government addressed it on the merits in its response brief and the district court actually issued a ruling on the merits in its order? Judge Richardson, this is different from judicially created preservation rules, right? This is a creature of statute. Congress has said that the statute just says that you have to make a motion. It doesn't say what has to be in the motion, right? It doesn't say you have to make each argument, right? That's the judicially created doctrine. The statute just says that you have to make a motion, right? But the statute also says that the defendant shall have the burden of proof of supporting such motion. And it's not clear how the defendant could have met his burden based on the October 2019 continuance if he never identified that he had a problem with that continuance. And further, the Supreme Court and Zedner made clear that the statutory waiver requirement serves additional purposes beyond what we think of as traditional preservation rules, right? It assigns the role of spotting violations to the defendant. It conserves resources by preventing the possibility of a late or untimely motion, mooting, an expensive and consuming trial, and it prevents gamesmanship. But if the court were to treat this as any other preservation rule and review this claim for plain error, it would subvert those purposes, right? It would functionally shift the burden to the district court to hone the record for potential violations. Or shift the burden to the district court to rely on waiver where it wants to rely on waiver, right? Where it wants to say, listen, you don't raise any other arguments, so I'm only addressing the arguments you've raised. But if the district court does it, I mean, do we have cases where the district court has addressed the very argument, the government did not rely on waiver in the district court, and then we find on appeal that the defendant waived the argument? I mean, that just seems like an odd posture. And I understand you think the statute affects this differently, but... Respectfully, Your Honor, I'm not sure at what point the government would have had an opportunity to argue waiver because the defendant just never raised this argument in the district court. He's raising it for the first time now, and that's why we're invoking waiver. Any other circuit, Your Honor, in the direction you suggest? Yes, there are five circuits that have adopted this rule. We acknowledge that one circuit in a concurring opinion in DICTA suggested that it did not prefer this rule, but otherwise, every other court of appeals to have addressed this issue has held that a defendant who doesn't challenge a particular period of delay waives that challenge on appeal. Do any of those involve the scenario where the district court addressed that very issue? Right? I mean, so I understand your cases are the ones where it's for the first time it shows up here. We've got the different scenario where the district court addressed the issue. The district court addressed the issue, but still did not pass upon the precise argument that the defendant is raising now. Did you force your objection or the district court addressed it? Did you make any indication that there was a judgment? No, that's not correct. This has been waived. We did not move for reconsideration of the order denying the motion to dismiss. Do you think the district court judged at all? No, Your Honor, because we didn't know that there would be any subsequent argument with regard to that October 2019 continuance. Well, there is because now you're making an argument that it's been waived. Because the defendant is raising a new argument in this appeal. It was given to him by the district court. Not this precise argument. Why don't you move along? Let's see where we go from here. Yes, Your Honor. Unless the court has other questions as to the speedy trial. I do. So assume for a minute that I disagreed with your waiver argument and so we got to the merits. I understand you to argue effectively that there are sort of two steps that have to happen here. One, there's got to be balancing. And I understand you to rely upon this ends of justice demand language. And let's assume that I agree with that. But the second step is that there's got to be findings on the record. And those findings can come later. We get that. And here, the district court judge made some findings, but I'm having a hard time understanding how we can rely on those. Because the district court says that the defense lawyer would have needed more time to get ready for trial given the voluminous discovery in the case. But I can't figure out how the original district judge could have possibly known about voluminous discovery. So that's an issue that only came up after the continuance was granted. There were no in the record that I could find about discovery. And so we know that couldn't have been the reason the original judge was relying on because the original judge couldn't have known about the voluminous discovery. Help me understand how I square that. The later judge has to be reflective of what the original judge did. And the original judge couldn't have been relying on voluminous discovery, could it? I'm not sure about that, Your Honor, but it is. The Judge Novak's subsequent findings are consistent with Judge Allen's grant of the continuance because of the nature of when it was granted. It was granted simultaneously with the order granting the first attorney's motion to withdraw. So this isn't a situation like Henry where the continuance was at just a status conference or Velasquez where it was after an arraignment and there was just no thought, no discussion about trial preparation. Here, there was a trial date on the books and the district court determined based on her assessment of the case that counsel needed more time to prepare for trial. We know that's a substantively valid consideration. So the fact that the district court might have elaborated on that after the fact doesn't undermine the validity of the findings that the initial district court judge made, at least in her mind, at the time that she granted the continuance. I'm happy to move on to the Fourth Amendment issues if Your Honors prefer. Telford had reasonable suspicion to conduct the dog sniff during the Louisiana stop based on the totality of the circumstances. First and foremost, he saw a gas can next to the car and he testified, which the district court found credible, that Telford had seen gas cans inside cars before and in his experience, drug traffickers bring gas cans with them when going to pick up drugs to avoid having to stop. In addition, you see a gas can in the back of a car, you can stop it. You can search it. Your Honor, it doesn't matter who the individual is. It doesn't matter who the individual is. Right around the gas can, same thing happened? No, Your Honor, but we have to look at the context, right? This wasn't sort of maybe a local road where you could be going home to fill up a lawnmower or something like that. This is interstate travel and also it's not just the gas can. We've got the inconsistent statements about his travel plans and then the defendant's excessive nervousness and evasiveness. Can you explain? I understand the officer testified to it and maybe I just have to accept that, but can you help me understand the logic behind it? Because what he testified to is that you carry the gas can so you don't have to stop, but he's by himself so he can't keep driving and use the gas can to fill it up. He's still got to stop, right? I'm having a little trouble with the basic logic, right? So if he said he doesn't want to stop at a gas station, all right, fine, but if he just doesn't want to stop, he's still got to stop, right? Each time, I mean, to empty the gas can into the car, he's got to stop. And so I had a little trouble understanding the logic of why the gas can was indicative of drug trafficking. Can you explain it to me? So I'm just inferring from the same record that you are, Your Honor, but my understanding is that perhaps it's quicker to just fill up the gas yourself on the side of the road rather than having to pull off to a gas station. How much gas was anything? It was a full five-gallon gas canister. That's at JA-404. And there, well, we know after the fact, there was a second can in the trunk as well. How much gas did it have in the car? There were two cans. I mean, how much in the, on the needle of the car? Oh, in the, that's not in the record, Your Honor. What was filled? But it was, the car was full, and where's he going to? I don't think that affects the reasonable suspicion analysis. The officer didn't testify that he could see the fuel gauge. And we like to reach out and make inferences, but this applies to anybody. I mean, whether you've got a lawnmower or not, you've got a gas can, based on where you're going with this, and that gives you probable cause. No, Your Honor, we're not asserting probable cause. Is who he is? No, we're not. No, Your Honor, this is reasonable suspicion, not probable cause. Reasonable suspicion. But that's where we are. But there were other factors as well, right? Why do you need this Louisiana stuff? You heard the question, Judge Richardson, asking, why are you going there? Why are you not just? Well, sure, I'm happy to argue harmlessness. We agree about any error in the admission of the five kilos. I'm not trying to make you happy. I'm just trying to decide why you're doing it. Why are you making the decision to go here if it appears that there is independent evidence from the second one, including the confession that's here, that would be supportive of it from that perspective? I can move on, Your Honor. Before, just to make sure that I understand the argument, you argue about this sort of inconsistency in travel plans. But when I look at Tilford's testimony, he doesn't even mention that in his suppression testimony. Can I even consider that? Or how can I consider that? It's like a statement in your record. It's like a passing reference you can hear on the audio of the stop. But it's hard to follow why it's inconsistent. It might be hard to follow why it's inconsistent, period, but certainly from the clip on the audio. What is the evidence on which I could rely on an inconsistent travel plan, given that your officer didn't even testify about it? So there were two pieces of evidence that were before the district court on this point. First, the defendant, when he testified in support of his motion, conceded that he lied to Tilford about where he was going. This is at JA-168. He was describing the stop. He said Tilford asked him about... Totally fair, but that doesn't go to whether Tilford could determine at that point in time that it was objectively inconsistent, right? So I could tell an entirely consistent story but lie about it, right? And so if I was just lying, that wouldn't show the story was inconsistent at all. In addition to the defendant's testimony, the government introduced into evidence as an exhibit at the suppression hearing Tilford's police report in which he recounted that the defendant first stated he was traveling from Lake Charles, Louisiana, where he visited family and was on his way. You could rely on hearsay statements made by a testifying witness when the government could have asked the testifying witness the very thing. I mean, it's plainly hearsay, right? You agree that's not substantive evidence. Right, but the ordinary rules of evidence do not apply at suppression hearings. The defendant has never objected to the district court's consideration of the police report. In fact, the defendant also introduced the police report. Totally fair, but like, I don't know, it makes me wonder whether that police report is like reliable, at least, given the rules of evidence, given that Tilford, when he's asked the question by the government, like, why did you do this? He lists off all these things and none of them is that, right? I mean, it sort of suggests to me that he doesn't even believe it. Well, Your Honor, we have to remember that the suppression hearing occurred about four and a half hours after the stop. The police report was a contemporaneous recollection of the stop. Totally fair, and so if the AUSA had refreshed his recollection, right, provided the report to him, right, a past recorded recollection, we can tell all kinds of stories about how the government could have gotten evidence in that was reliable for that, but it doesn't seem to. I hear you, Your Honor, but of course, this was a fact finding the district court made, and so on clear error review, certainly the only evidence in the record confirms that his travel plans were inconsistent. Speak to the nervousness. It is extreme nervousness. There's a video that we have here. Looks clear, at least to me, a video that at some point he's not behaving nervously. In fact, he walks to this police car and he responds to police commands and follows his direction. He does so without delay. Does the nervousness that would form the basis for a reasonable suspicion have to be continuous throughout, or can an individual initially be nervous and then subsequently be calm, let's say, and yet that initial nervousness be the basis for reasonable suspicion? Well, Your Honor, we would contest the defendant's argument in reply that his nervousness subsided. I'm talking about the video. I hear you, Your Honor, but the video- You said it's a factual determination here, and that factual determination is supported by this video here. Here's to be rather clear, he's not extremely nervous in that latter part of that video. The question being, whether he is or not, does that affect the analysis if, in fact, at some point, an officer stops, and it would be reasonable that in any traffic stop, I don't care who you are, a person can be nervous if an officer stops you on the road. Then after you begin to talk, you begin to calm down or something. How then do we then say, well, extreme nervousness has been the basis for it, which is used quite often in a circumstance that would indicate it depends greatly on the individual? There are a lot of people who would just break down crying if a police officer stops them. How has that then become the basis for a reasonable suspicion simply because there's a natural human reaction that's shared by so many others? Then this video, as you said, you could test it, but the video is just here. Your Honor, I would just urge that the defendant, first of all, weigh this argument because he never raised it in the opening brief. It was raised for the first time in reply. He never made this in the district court, even though he testified in support of his motion. He never argued that his nervousness subsided. I don't believe that the video shows that his nervousness subsided because we don't have a relevant comparator. We cannot see what occurred during the interview before he exited the car. In fact, I would submit that the district court's finding was not clearly erroneous. The court can look at a video and determine whether there's evidence that an individual is nervous. Not this video because we can't see the first part of the intervention. If you have a video of an individual, do you think a court is in a position to say, if there's testimony that this individual is extremely nervous, it's not showing on this video? No, Your Honor. I would just add that, so, under the Supreme Court's decision in Carroll and this court's decision in Hahn, the court can also consider evidence deduced at trial in trying to determine the correctness of a suppression ruling. And in fact, Guilford's testimony at trial indicates that the defendant's nervousness did not subside. He was recognizing, as Your Honor was getting at, that most people, the average person, is nervous when they're stopped by a police officer. Can you help me understand the sort of similar question I had about the travel plans? When I read Tilford's, at least, suppression testimony, I have a hard time finding extreme or excessive nervousness, right? I mean, he says it was very plump, right? It was deliberate answers. Yes. So, that part I get. Yes. But what I don't see, or maybe I'm just skipping over it, is any reference to this is extreme or excessive or unusual in his experience? Well, that was a fact-finding the district court made in its order, and I don't think nervous or extreme nervousness. But based on what is what I'm trying to get to, right? So, is the argument that it's based on this line, that his answering was clunky and deliberate, that you think from that testimony, you can conclude that that was excessive or extreme nervousness? What is the other factual basis that supports the finding that it was excessive or extreme nervousness? We also have his police report, which I know we've discussed. There are some concerns about that. But at JA-403, Tilford wrote the defendant, quote, was extremely nervous during the interview. And I don't believe that nervous or extreme or excessive nervousness is a magic word, right? The district court is making a fact-finding based on the description of the defendant's behavior. In any event, of course, we agree with you, Judge Richardson, that any error in admitting the five kilos seized during that traffic stop was harmless, given the overwhelming evidence that was introduced at the time. Do you really argue that it was harmless on the PWID conviction? It was harmless as to all three convictions, Your Honor. I see my time has expired. All right. Judge Trachseler, do you have any questions? I do, Judge Wynn, if you would indulge me just a second. This is a question mostly of personal curiosity. It has to do with the November stop of the defendant by Trooper Miller in November. Yes, Your Honor. After Trooper Miller had finished with all the things he had to do with regard to the stop, the defendant was in his car, Trooper's car, I believe he was handcuffed, and then he was taken over to meet with a DEA agent. My question is, after the Trooper had finished with him, after the purpose of the stop had been completed, and when he was being transported in handcuffs, what's his custody status at that point? Specifically, is he under arrest? Your Honor, my understanding of the record is that he was in custody. I don't know if he was not formally arrested, but he was in custody. Then on what basis was he in custody? Based on Miller's collective knowledge of the probable cause that Smith had, that the defendant was engaged in drug trafficking. He's in custody, but he's not under arrest? Right. Okay. Thank you. Thank you, Judge Wynn. Thank you very much. We'll hear from the appellant. Thank you, Your Honor. To address a number of the issues that were raised with my colleague, Mr. Smart identified at the hearing on the Speedy Trial Act, his attack of the continuance from October of 2019. There was a colloquy that I cited in my reply brief that discusses that, raising that. There was no waiver by Mr. Smart. I'm sorry. I want to make sure I understand that. Your claim is that in the handwritten motion that submitted, he properly raised the Speedy Trial Act violation with respect to that continuance? In his handwritten motion, Your Honor, he recites the course of events in his prosecution. And then makes a Sixth Amendment argument under the Baker factors that doesn't mention that at all. He gives a factual summary of everything that's happened. And then he makes a Sixth Amendment argument. And at the hearing, he and Judge Novak have a colloquy about the October continuance of the December trial date. And when you look at Henry and you look at Velazquez, you look at all the cases from this circuit, it never says there's got to be a specific identification of a particular period. The statute doesn't say so. The statute simply says it has to be a written motion. But the basic principles of waiver that we have is that you don't get to make, you don't get to say I have a Fourth Amendment violation without identifying which of the traffic stops that you think is a violation. You don't get to say there's a Speedy Trial Act violation and not identify what conduct you think violated it. So it's not about the rule. And that's, he did not preserve that issue. Now, you might have an argument that the judge addressed it anyway, and that's a separate story. But I want to, I'm just want to make sure I understand. How is it that he like made that argument? He, his motion to dismiss was based not only on the Sixth Amendment, but also on the Speedy Trial Act. And when he was at the hearing, he contemporaneously, at that hearing, raised this very issue and had a colloquy with the judge about it. So the way I look at it, Your Honor, is the act does not require specificity in the written motion. It requires a written motion, which Mr. Smart did without dispute. Were the grounds of his challenge, the Speedy Trial Act, presented to the district court? They were. They were at the oral argument on the motion. And I believe that under this court's case law and under the statute, and when you look at Zedner and its very dim view of waiver in Zedner, I believe that was sufficient. I want to address the harmlessness issue from the Louisiana traffic stop. It's important to recognize that the only physical narcotics against Mr. Smart at trial were the five kilos from Louisiana, 27 grams from Newport News in August of 2018, and a little less than 27 or just over 27 grams from the Fitment Control Buy. If you're painting someone as an interstate drug dealer and the drugs that the government's putting on the table in front of the jury consist of five kilos from an illegal stop, search, and seizure compared to two less than one ounce quantities. Totally fair for the conspiracy count, but help me understand how that affects the two arguments. That argument is about the conspiracy count, and I understand that one. What I don't understand is how it affects the two PWIB counts, right? I mean, the jury's instructed you've got to consider each count separately. Those counts are not about being some broad interstate drug dealer, right? They're about these two PWIB. Well, if you look at the August one ounce, why does that become possession with intent to distribute? It becomes possession with intent to distribute. Because he sold that same amount. For him, it's not like consumption quantity, right? It's like the amount he sold in May. We got a pretty good idea that he sells that kind of quantity. In fact, we got a pretty good idea people sell a lot much included. If you look at May, though, your honor, he didn't sell it. Jones sold it to Pitman, right? So he's put into that because why in Louisiana in 2017, he was called the five kilos. Thank you very much. Thank you. Thank you both.
judges: James Andrew Wynn, Julius N. Richardson, William B. Traxler Jr.